

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-17-00029-CR

JOE DAVID MOON                                                        APPELLANT

V.

THE STATE OF TEXAS                                                        STATE

----------

### FROM THE 30TH DISTRICT COURT OF WICHITA COUNTY
### TRIAL COURT NO. 56,532-A

----------

## MEMORANDUM OPINION[1]

----------

A jury found appellant Joe David Moon guilty of one count of aggravated sexual assault of a child and two counts of indecency with a child by sexual contact. On both indecency counts, the jury further found that the children were under 14 years of age at the time of the offenses. For the aggravated-sexual-assault-of-a-child conviction, the jury assessed Moon's punishment at 60 years'

---

[1]See Tex. R. App. P. 47.4.

imprisonment and a $10,000 fine. On both indecency convictions, the jury assessed Moon's punishment at 15 years' imprisonment and a $5,000 fine. The trial court sentenced Moon accordingly and ordered the two indecency convictions to run concurrently with each other but consecutively with the aggravated-sexual-assault conviction. In two points, Moon argues that the trial court erred by (1) finding that he voluntarily absented himself from trial and (2) overruling his objections to numerous arguments that the State made during the trial's punishment phase. We affirm.

## Evidence

Moon does not contest the sufficiency of the evidence. The jury convicted him of three counts of sexually abusing his granddaughter and step-granddaughter. Although Moon was not charged with it, there was evidence that he also sexually abused another granddaughter. For purposes of this opinion, we refer to all three as Moon's granddaughters.

## Point One

### Moon voluntarily absented himself from trial

In his first point, Moon argues that the trial court erred by finding that he voluntarily absented himself from trial.

*Background*

On Thursday, November 3, 2016, after both the State and Moon had rested and closed and with Moon present, the trial court excused the jury for the

2

remainder of the day and informed the jurors that it would present the guilt–innocence charge to them at 9:30 a.m. on the following Monday morning.

On that Monday morning, however, Moon failed to appear. At 9:50 a.m., the trial court forfeited Moon's bond, recessed the trial until 1:00 p.m., and informed the parties that the trial would resume then with or without Moon.

At 1:00 p.m., outside the jury's presence, the trial court conducted a brief hearing addressing Moon's absence. James Carpenter, an investigator for the district attorney's office, testified that based on an earlier tip about where Moon had recently been spotted, he found Moon that morning at the Kiowa Casino in Oklahoma playing slot machines.[2] Carpenter, who was familiar with Moon's appearance during trial, testified that Moon now looked different because he had cut his hair. After investigators took him into custody, Moon asked if there had been a mistrial and was told no. A deputy from the Cotton County (Oklahoma) Sheriff's Office arrested Moon on the active warrant out of Wichita County, Texas, and at the time of the 1:00 p.m. hearing Moon was in jail in Cotton County, Oklahoma, awaiting extradition back to Texas. Arguing that Moon had voluntarily absented himself, the prosecutor asked that the trial proceed.

Moon's defense counsel then introduced an affidavit from his own investigator, Don Spaulding. Although the prosecutor objected to the affidavit on hearsay grounds, the trial court stated on the record that it would "take a look at

---

[2]The Kiowa Casino is roughly twenty miles from Wichita Falls, Texas, where the trial was taking place.

3

it," agreeing with defense counsel that "the rules of evidence would not apply in this proceeding." In the affidavit, Spaulding averred:

> On November 7, 2016 [the same date on which Moon was found at the casino], I had a conversation with Max Green who works for A to Z Bail Bonds. During this conversation, Mr. Green stated that he had conversations with Joe Moon stating that he heard there had been a mistrial, and Joe probably would not need to show up to his court hearing on this date because "he may get a whole new trial or resetting, I was just trying to keep his nerves down and give him some kind of hope." Mr. Green also stated that he spoke to Mr. Moon at 6:30 on Saturday [November 5]. He stated that he told Joe that there had been a mistrial.

Moon's defense counsel then moved to reinstate Moon's bond and to continue the trial. The trial court denied both and said, "We will proceed without Mr. Moon, who has voluntarily absented himself from the proceedings."

During a hearing on Moon's later motion for new trial, Green—Moon's bondsman—testified that he knew there had been no mistrial but told Moon there might be one simply to encourage Moon to be in court on Monday. Green testified that he made this effort because an informant had already told him that Moon did not intend to come to court. Green admitted lying to Moon to try to ensure his presence.

At the hearing on his new-trial motion, Moon also introduced his affidavit in which he stated:

> Max Green communicated with me on or about Friday, November 4, 2016 and over the subsequent weekend. His communications led me to believe that there had been a mistrial in my case. I did not freely and voluntarily absent myself from the court proceedings. After I was subsequently arrested, I was being held involuntarily in

4

Oklahoma. Had I been given the opportunity, I would have returned to Wichita County and participated in my trial.

Again concluding that Moon's absence was voluntary, the trial court overruled Moon's motion for new trial.

*Standard of review*

Article 33.03 of the code of criminal procedure, in relevant part, provides that "[i]n all prosecutions for felonies, the defendant must be personally present at the trial," but adds the caveat that "in all cases, when the defendant voluntarily absents himself after pleading to the indictment or information, or after the jury has been selected when trial is before a jury, the trial may proceed to its conclusion." Tex. Code Crim. Proc. Ann. art. 33.03 (West 2006).

As we have discussed, the trial court twice addressed whether Moon's absence was voluntary—initially when it decided to proceed with the trial in his absence and again at Moon's motion-for-new-trial hearing. In his brief, Moon does not distinguish between the two events but relies on both to support his arguments.

When reviewing whether the trial court properly decided to proceed with trial in a defendant's absence, we are not restricted to considering evidence that was before the trial court at the time it made its ruling, nor must we ignore evidence that developed after it ruled (such as evidence presented at a motion-for-new-trial hearing). *Moore v. State*, 670 S.W.2d 259, 261 (Tex. Crim. App. 1984); *Polk v. State*, No. 02-02-00038-CR, 2003 WL 21197404, at *2 (Tex.

5

App.—Fort Worth May 22, 2003, no pet.) (mem. op., not designated for publication). We review a trial court's determination that a defendant is voluntarily absent under an abuse-of-discretion standard. *Polk*, 2003 WL 21197404, at *2. As long as there was some evidence before the trial court from which it could infer that the defendant was voluntarily absent, the court did not abuse its discretion. *See Heard v. State*, 887 S.W.2d 94, 99 (Tex. App.—Texarkana 1994, pet. ref'd); *see also Summage v. State*, No. 06-14-00210-CR, 2015 WL 3486031, at *2 (Tex. App.—Texarkana June 3, 2015, no pet.) (mem. op., not designated for publication).

We review a trial judge's motion-for-new-trial denial also under an abuse-of-discretion standard. *Colyer v. State*, 428 S.W.3d 117, 122 (Tex. Crim. App. 2014). We do not substitute our judgment for the trial court's; rather, we decide only whether the trial court's decision was arbitrary or unreasonable. *Id.* A trial court abuses its discretion by denying a motion for new trial when no reasonable view of the record could support its ruling. *Id.* We view the evidence in the light most favorable to the trial court's ruling and presume that all reasonable factual findings that could have been made against the losing party were in fact made against that losing party. *Id.* At a motion-for-new-trial hearing, the judge alone determines the witnesses' credibility and does not have to believe even uncontroverted or uncross-examined testimony. *Id.*

*Discussion*

The evidence showed that Green's informant had told him even before Green communicated with Moon that Moon did not intend to appear at trial the following Monday. The evidence also showed that Green communicated with Moon for the express purpose of encouraging Moon to appear by giving him a (false) hope that the trial court would declare a mistrial.[3] The trial court could have reasonably concluded that Moon never intended to appear for trial on Monday and that Moon fabricated a story about misunderstanding Green to try to plausibly explain his absence. When ruling on Moon's motion for new trial, the trial court was the sole judge of the weight and credibility of the evidence, including Moon's affidavit. *See Odelugo v. State*, 443 S.W.3d 131, 137 (Tex. Crim. App. 2014); *Graham v. State*, No. 12-15-00160-CR, 2016 WL 3568056, at *3 (Tex. App.—Tyler June 30, 2016, no pet.) (mem. op., not designated for publication).

Moon argues from the assumption that he genuinely believed there had been a mistrial. As the factfinder, the trial court was free to disbelieve Moon's claimed genuine belief. *See Colyer*, 428 S.W.3d at 122. Moon's affidavit did not mention having contacted his attorney or the trial court to verify anything his bondsman had told him. But even assuming Moon genuinely believed the trial

---

[3]At the hearing on Moon's new-trial motion, Green acknowledged that one of his concerns about Moon's not showing up that Monday was financial: Green recalled that the bonds for which he would be on the "financial hook" totaled "over 100,000."

7

court had declared a mistrial, his affidavit does not explain why that development would have excused him from appearing on Monday to learn about his retrial, or simply to confirm the status of his case.

Moon also complains that his absence prejudiced him because the prosecutor used his absence to the State's advantage and because he was not there to defend himself. But Moon's absconding in the middle of his trial was what invited the prosecutor's attacks; although the prosecutor delivered "hard blows," they were fair ones. *See Jordan v. State*, 646 S.W.2d 946, 948 (Tex. Crim. App. 1983). By his actions, Moon waived his right to be present. *See Taylor v. United States*, 414 U.S. 17, 17, 20, 94 S. Ct. 194, 195–96 (1973) (holding trial court properly denied defense counsel's motion for mistrial based on argument that defendant's absence would taint jurors' minds and would deprive him of his right to confront witnesses; defendant's voluntary absence constituted waiver of his right to be present). Moon could have avoided any alleged prejudice by appearing for his trial instead of going to Oklahoma to play the slots.

Moon contends that because he was willing to return to the trial and because his jailing in Oklahoma prevented him from returning, his absence was involuntary. Moon appears to argue that he wanted to reclaim his right to participate in his trial but that his incarceration in Oklahoma kept him from doing so, referring us to *Illinois v. Allen* and *Morrison v. State*. *See Illinois v. Allen*, 397 U.S. 337, 343, 90 S. Ct. 1057, 1061 (1970) ("Once lost, the right to be present can, of course, be reclaimed as soon as the defendant is willing to

8

conduct himself consistently with the decorum and respect inherent in the concept of courts and judicial proceedings."); *Morrison v. State*, 480 S.W.3d 647, 651, 662 (Tex. App.—El Paso 2015, no pet.) (holding that Texas does not have a bright-line rule on what steps a trial court must take to ensure that a defendant is given a reasonable opportunity to return to the courtroom).

But those cases involve instances where the trial court removed the defendants from their trials because the defendants were disruptive. Here, the trial court did not remove Moon from the proceedings; Moon removed himself. *See Smith v. State*, 494 S.W.3d 243, 251–54 (Tex. App.—Texarkana 2015, no pet.) (holding trial court did not abuse discretion by denying motion for continuance after defendant's failed suicide attempt and subsequent hospitalization); *Bottom v. State*, 860 S.W.2d 266, 267 (Tex. App.—Fort Worth 1993, no pet.) (holding that defendant who was in a hospital because he had attempted suicide during trial was voluntarily absent).

*Allen* and *Morrison* are inapposite for another reason: those defendants' ability to return to trial depended on whether the trial judge would allow it. Here the trial judge was not the impediment to Moon's returning to the trial. Even though, logistically, Moon could not return because he was locked up in Oklahoma, it was his voluntary decision to go gamble that landed him there. *See Smith*, 494 S.W.3d at 251–54; *Bottom*, 860 S.W.2d at 267.

Under article 33.03, factors such as the likelihood that the trial can take place soon with the defendant present, the difficulty of rescheduling, and juror

9

inconvenience are not required to be analyzed, although the trial court, in its discretion, may consider such matters and others when deciding whether to proceed. *Moore*, 670 S.W.2d at 261. As Judge Clinton wrote in his *Moore* concurrence, "Interests of both the State and the court in the speedy and orderly administration of justice justified the trial court's refusal to continue the case under these circumstances." *Id.* at 262 (Clinton, J., concurring). Stated another way, "'The busy trial courts of our state cannot stop the wheels of an already burdened criminal justice system because a defendant chooses to be absent from his own trial.'" *Smith*, 494 S.W.3d at 254 (quoting *Sanchez v. State*, 842 S.W.2d 732, 733 (Tex. App.—San Antonio 1992, pet. ref'd)). Because Moon voluntarily absented himself from trial, the trial court did not abuse its discretion by proceeding without him. *See* Tex. Code Crim. Proc. Ann. art. 33.03.

We overrule Moon's first point.

## Point Two

### Prosecutorial arguments

In Moon's second point, he argues that the trial court erred by overruling his objections to numerous arguments that the State made during the trial's punishment phase, pinpointing three particular instances when the prosecutor allegedly argued outside the record.

*Mistrial*

First, Moon contends that the prosecutor speculated that he avoided trial in

a deliberate effort to generate a mistrial. He directs us to the following argument:

> [Prosecutor]: And then we talk about Paragraph 10, that's the evidence of extraneous acts. And that's what we're talking about, the evidence . . . regarding [Moon's] being at the casino yesterday morning when he was supposed to be here for closing arguments. And you notice that one thing that [defense counsel] didn't bring up and what I asked [the investigator] is what did [Moon] say? He said, well, I thought there was a mistrial. He's [gaming] you, ladies and gentlemen. He thought that he could [game] the system by going up to the casino while all of you spent your morning up here; that we were supposed to be deliberating your guilt/innocence verdict, and instead he thought that he could get a mistrial by going up and playing the slot machines.
>
> [Defense counsel]: Objection, Judge. Calls for speculation and goes outside the record.
>
> THE COURT: Overruled.

*Impact on victim's lives*

Next, Moon maintains that the prosecutor speculated at length about how

his actions would impact his grandchildren's future lives. The prosecutor argued:

> The view of the children. You know, [defense counsel] wants to talk about how there's not any evidence of lasting physical trauma. And I'll submit that there is no evidence of that at the moment.
>
> When [you] get to emotional trauma, however, the trauma is only beginning. You know, these girls have spent some time in counseling, they've started to realize that they need to talk about this and it's something that's going to sit with them.
>
> You know, every time [Moon's granddaughter] drives by that house she's going to remember her grandfather. Every time [Moon's other granddaughter] has a grandparent's day or some other event that's calling for her grandparents, she's going to remember what her step grandfather did to her.

11

[Defense counsel]: Objection, Judge. Going outside the record.

THE COURT: Overruled.

[Prosecutor]: They're going to be dealing with all of these things for the rest of their life, and, you know, their issues with trust in people, in men specifically. We don't know the extent that that's going to harm them. And I can't speculate standing before you today, but certainly you can consider and appreciate the lasting damage and the stigma that this Defendant has left in these girl[s'] wake. And I'd ask you to consider that as well when you talk about what an appropriate sentence is.

I'd like you to consider this case from the eyes of the children. That [child's] sleeping or pretending to sleep on the couch to scare her grandfather. She's not afraid of him. But he picks her up the first time, she's never been picked up before, and she doesn't know what to do. And I want you to think about how she felt when she was brought into that room and laid on the mattress and [Moon] went in a circular form and penetrated her because that's the first sexual experience that she will ever have and that's the one that she's going to remember for the rest of her life.

And with regard to [the other granddaughter] and to [Moon's third granddaughter] as well. This is—we're dealing with their first sexual experience at the hands of [their grandfather]. It's going to have lasting [e]ffects on these girls and I ask you—

[Defense counsel]: Objection. Going outside the record.

THE COURT: Overruled.

[Prosecutor]: I'd ask you to consider that when deciding what the appropriate verdict is.

*Recidivism*

Lastly, Moon asserts that despite there being no evidence about his propensity for recidivism, the prosecutor argued:

[Moon] is 61. There's nothing in the record to say that he won't do this at 71, at 81, at 91.

[Defense counsel]: Objection, Judge. Again, going outside the record.

THE COURT: Overruled.

[Prosecutor]: If the opportunity presents itself, there's nothing to say that he won't do it again.

*Standard of review*

To be permissible, the State's jury argument must fall within one of the following four general areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; or (4) plea for law enforcement. *Felder v. State*, 848 S.W.2d 85, 94–95 (Tex. Crim. App. 1992), *cert. denied*, 510 U.S. 829 (1993); *Alejandro v. State*, 493 S.W.2d 230, 231 (Tex. Crim. App. 1973). The Texas Court of Criminal Appeals has "consistently held that counsel may during final argument draw from those facts in evidence all inferences that are reasonable, fair, and legitimate and that he has wide latitude without limitation in this respect so long as the argument is supported by the evidence and offered in good faith." *Vaughn v. State*, 607 S.W.2d 914, 922–23 (Tex. Crim. App. [Panel Op.] 1980). We review a trial court's ruling on an improper-jury-argument objection for an abuse of discretion. *See Garcia v. State*, 126 S.W.3d 921, 924 (Tex. Crim. App. 2004); *Ramires v. State*, No. 02-16-00185-CR, 2017 WL 4542857, at *4 (Tex. App.—Fort Worth Oct. 12, 2017, no pet.) (mem. op., not designated for publication).

*Mistrial*

When the investigators confronted Moon at the Kiowa Casino, he asked whether there had been a mistrial. One reasonable inference from Moon's question was that Moon was trying to explain to the investigators that he was in Oklahoma because he thought the trial court had declared a mistrial and was asking the investigators to confirm that. But the flaw in this inference is that Moon's question effectively conceded that he entertained doubts about whether the trial court had declared a mistrial but went to Oklahoma anyway.

Another reasonable inference is that when Moon asked that question, he was asking the investigators whether his absence had caused the trial court to declare a mistrial. Green testified that he had told Moon that a mistrial might mean that the prosecutors would give him a different offer or a retrial. Either way, Green had communicated to Moon that a mistrial—whatever its source—was something that potentially worked to Moon's favor, and a reasonable inference is that Moon thus wanted a mistrial, even if he had to be its cause. *See Dues v. State*, 634 S.W.2d 304, 305 (Tex. Crim. App. [Panel Op.] 1982) (stating that factfinder may infer intent from acts, words, and conduct of the accused); *Turner v. State*, Nos. 02-11-00070-CR, 02-11-00071-CR, 2013 WL 530972, at *1 (Tex. App.—Fort Worth Feb. 14, 2013, pet. ref'd) (mem. op., not designated for publication) (same).

Because the prosecutor's argument was a reasonable deduction from the evidence, we hold that the trial court did not abuse its discretion by overruling

14

Moon's objection. *See Felder*, 848 S.W.2d at 94–95; *Ramires*, 2017 WL 4542857, at *4.

*Impact on victims' lives*

Moon argues that there was no evidence that his sexually abusing his own granddaughters would adversely affect their lives. But there was evidence. A therapist for sex offenders testified about the effect that sexual abuse has on children when the perpetrator is a trusted family member:

> When the perpetrator is an authority figure literally -- an authority figure with whom the child has some kind of familial relationship or family friend, processing the abuse is difficult because children tend to think in black and white. There are good guys and there are bad guys, and they typically think that people that hurt children or would do something to cross those kind of boundaries would be in the bad guy category. So when somebody who they think of as in the good guy category does that, it's extremely confusing. They may have feelings of affection or love for this person, but then this person is doing something that feels shameful, violating, and wrong. And most often, children don't know what to do with that. There's no framework that they have to look at that with them.

She added:

> Children obviously in these situations feel extremely powerless. And because of that and the shame and the secrecy that goes with child sexual abuse, they often feel somehow like they are to blame; that they should have done something. And I've talked to many adults who are in this situation who, you know, particularly grown men, but women as well, who were abused as children and still feel a lot of shame and blame themselves.

Finally, she gave an example of how the consequences of abuse might surface years later:

> I actually had a relatively recent case. The perpetrator, who did admit to the offense, he had molested his biological daughter, oh,

15

gosh, she's 28 now, he had molested her when she was very young, you know, 9ish, something like that, 9 or 10, and never said anything until her brother, so the perpetrator's son, had a child and it was a little girl. And the daughter, who is now 28, absolutely, for lack of a better term, she freaked out. She was really, really worried about her dad, who now had this little baby granddaughter, doing something because she remembered what had happened to her. And actually, now that I'm thinking about this, the abuse occurred with her, I believe, from the ages of 5 to 9 so it was ongoing for a long period of time.

See *Vaughn*, 607 S.W.2d at 922–23 (holding that, with wide latitude, inferences are permissible if they are reasonable, fair, and legitimate and have evidentiary support).

Additionally, the prosecutor was responding to Moon's argument that there was no evidence of emotional trauma. See *Felder*, 848 S.W.2d at 94 (holding that jury argument answering opposing counsel is permissible).

The trial court did not abuse its discretion by overruling Moon's objection. See *Felder*, 848 S.W.2d at 94–95; *Ramires*, 2017 WL 4542857, at *4.

### *Recidivism*

Moon argues that there was no evidence that he was a risk for recidivism. We disagree. There was evidence that Moon had sexually abused three of his granddaughters and that some of the abuse went back several years. That is the very definition of recidivism: "repeated relapse into criminal or delinquent habits." *Recidivism*, Webster's Third New Int'l Dictionary (2002). Because Moon had already shown a penchant for this kind of conduct, we hold that it was a reasonable deduction from the evidence that Moon presented a continued risk for

recidivism; the trial court did not abuse its discretion by overruling Moon's objection. *See Felder*, 848 S.W.2d at 94–95; *Ramires*, 2017 WL 4542857, at *4.

We overrule Moon's second point.

## Conclusion

Having overruled both of Moon's points, we affirm the trial court's judgments.

/s/ Elizabeth Kerr
ELIZABETH KERR
JUSTICE

PANEL:  MEIER, GABRIEL, and KERR, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  June 28, 2018